# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

Houston Division

| | |
|---|---|
| Acute Care EMS, LLC<br>*Plaintiff*<br>v.<br><br>U.S. Department of Health and Human Services; Sylvia Mathews Burwell, Secretary, Department of Health and Human Services; TrailBlazer Health Enterprises, LLC; Health Integrity, LLC, Q² Administrators, LLC; Chase Consulting Group, LLC<br>*Defendants* | Case No.  4:17-cv- 00116<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: (check one)   ☐ Yes  X No |

## COMPLAINT FOR CIVIL CASE ALLEGING

**(28 U.S.C. §1331; Federal Question)**

Plaintiff, by and through undersigned counsel, bring this Complaint against the above named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

### INTRODUCTION

1. This is a civil action in which Plaintiff is seeking to recover damages for the wrongful implementation and execution of 42 U.S.C. §1395ff also known as §1869 of the Social Security Act ad 42 U.S.C §1395ddd which required the Defendants to follow these rules in the fair determination of claims during the appeals process.

2. Plaintiff seeks monetary damages due to the violations of federal statutory law.

1

**JURISDICTION AND VENUE**

3. The Court has jurisdiction over the lawsuit under 28 U.S.C. §1346(b) because the suit involves a claim against the United States for loss of property caused by the negligent acts of a government employee while acting within the scope of its employment.

4. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§1331 and 1346.

5. Supplemental Jurisdiction is conferred on this court pursuant to 28 U.S.C. §1367.

6. Venue is proper in this district pursuant to 28 U.S.C. §1402(b) because the plaintiff resides in this district.

7. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b)(2) and 1391(e) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

**CONDITIONS PRECEDENT**

8. Plaintiff has not provided notice to the Defendants under the Federal Tort Claims Act. The time to provide notice under 28 U.S.C. §2401(b) is two years after such claim accrues. The order of the Administrative Judge was not final until the expiration sixty days from the January 13, 2015 decision. This claim was originally filed to this Court on January 13, 2017. It is Plaintiff's intention to provide notice pursuant to the Federal Tort Claims Act within 60 days from January 13, 2017. Should this Court determine that the notice requirement of 28 U.S.C. 2401(b) has not been met, it is Plaintiff's belief that the notice requirement should be tolled on equitable grounds because, as further discussed below, Plaintiff's operations temporarily ceased (due to the actions of Defendants), thus rendering Acute Care EMS Inc. unable maintain operations and thereby unable to garner funds to initiate the claim and provide notice of claim sooner. It is equitable to allow Plaintiff an opportunity to cure a defect largely created by Defendants conduct.

## PARTIES

9.   Plaintiff, Acute Care EMS, Inc. is a Texas Corporation and provides ambulance services in Houston, Texas. The registered office is 525 NORTH SAM HOUSTON PARKWAY, SUITE 370 D, HOUSTON, TEXAS 77060.

10.   Defendant, the US Department of Health and Human Services ( "HHS"), is an executive agency of the United States Government and is responsible for providing effective health and human services including regulating the Medicare Program which is the subject of this lawsuit.

11.   Defendant, Sylvia Mathew Burwell, is the Secretary of the United Stated Department of Health and Human Services. In this capacity, she is responsible for the operation and management of HHS. Defendant Burwell is sued in her official capacity only.

12.   Defendant, TrailBlazer Health Enterprises, LLC ("TrailBlazer"), is a Limited Liability Company based in Texas, and is a Medicare Administrative Contractor of HHS.  The registered office is located at, 1999 BRYAN STREET, SUITE 900, DALLAS, TEXAS 75201, its registered office.

13.   Defendant, Health Integrity, LLC d/b/a HI Program Integrity, LLC ("Health Integrity"), is a Limited Liability Company based in Texas and is a Zone Program Integrity Contractor for HHS. The registered office is located at, 1999 BRYAN STREET, SUITE 900, DALLAS, TEXAS 75201.

14.   Defendant, $Q^2$ Administrators, LLC ("$Q^2$A"), is a Limited Liability company based in South Carolina and is a Qualified Independent Contractor. The registered office is located at, 300 ARBOR LAKE DRIVE, SUITE 1350, COLUMBIA, SOUTH CAROLINA 29223.

15.   Defendant, Chase Consulting Group, LLC, is a Limited Liability Company based in Virginia, and is a Healthcare Review Consultant for TrailBlazer. The registered office is located at, 8309 CENTRAL AVENUE, ALEXANDRIA, VIRGINIA, 22306 in FAIRFAX COUNTY VIRGINIA.

## FACTUAL ALLEGATIONS

16. Plaintiff, Acute Care EMS, Inc. operates an ambulance company in Houston, Texas.

17. Plaintiff is a Medicare authorized Provider Ambulance Services to Medicare patients.

18. Many of the patients that Plaintiff transports receive Medicare.

19. As long as the ambulance transport satisfies the "medical necessity" requirement under the Social Security Act and Medicare coverage criteria, Plaintiff would receive payment from Medicare for services offered to Medicare patients.

20. TrailBlazer Health Enterprises, LLC is a Medicare Administrative Contractor ("MAC") assigned to Plaintiff's region. On a month to month basis, lasting from 2008 until 2010, TrailBlazer required Acute Care EMS Inc., to submit documents necessary to conduct Prepayment Reviews to determine if Medicare would pay for the ambulance services provided to Medicare patients.

21. These claims were deemed appropriate and Plaintiff was paid by Medicare.

22. During the course of business, Acute Care EMS developed a working relationship with several private and public businesses. For example, Plaintiff had a contract with the Texas Department of Corrections transporting prison patients from the prison to the hospital.

23. In 2010, Health Integrity, LLC, a Zone Program Integrity Contractor ("ZPIC") began an audit of Acute Care EMS covering all claims submitted beginning July 1, 2008 through June 30, 2010.

24. Post-payment audits extrapolate a sample from a universe of claims to determine the total overpayment of Medicare claims made to Providers.

25. On September 23, 2010, Health Integrity sent a Records Request to Plaintiff to initiate an audit.

26. On November 10, 2010, Health Integrity claims analysts prepared the Provider Summary of Medical Review Findings ("MR Findings Memorandum").  This memorandum found 100% error in the claims sample.  The MR Findings Memorandum directed Plaintiff to "Please see Medical Review Findings Spreadsheets for complete details."

27. On January 5, 2011, Health Integrity mailed a Recoupment Recommendation Letter to Plaintiff claiming an overpayment amount of $1,242,517.00. This letter included a ZPIC Quality Checklist regarding the extrapolation overpayment calculation.

28. On February 10, 2011 and March 7, 2011, Health Integrity Mailed MR Audit Results to Plaintiff. This results letter advised Plaintiff that TrailBlazer would be sending notification of overpayment.

29. On February 16, 2011, TrailBlazer issued an Overpayment Demand Letter to Plaintiff. According to this letter, Plaintiff received overpayments in the amount of $1,242,517.00.

30. On April 12, 2011, Plaintiff filed a Request for Redetermination of the TrailBlazer demand. In this request, Plaintiff objected, in writing, to the statistical sampling methodology used by Health Integrity, stating that Defendant did not followed the guidelines provided by the Centers for Medicare & Medicaid Services Manual ("CMS Manual").

31. Although the term for the contract with the Department of Corrections officially ended in 2014, the Department no longer requested Plaintiff's services because the company was unable to staff appropriately to meet the needs of the contract due to loss of revenue. Available employees had to be redirected to address the information requested for the audit.

32. In 2011, while going through the Medicare Process, Plaintiff was forced to cease operations.

33. During the time of the audit Plaintiff was permitted continue operating and submitting claims to Medicare. However, Plaintiff's approved claims for Medicare reimbursement were retained by Medicare.

34. On June 22, 2012, TrailBlazer completed its Redetermination. This Redetermination referred to the overpayment amount as $1,232,625.16 but did not incorporate a spreadsheet showing the MACs disposition and the amounts overpaid on each of the forty claims and 155 claim lines in the sample. This redetermination stated an overpayment amount nearly $9,900 less than the amount stated in the Demand Letter.

35. On June 27, 20012, Plaintiff submitted a request for reconsideration. Then on July 3, 2012, Plaintiff submitted a Provider's Rebuttal and Statement of Position.

36. On August 20, 2012, TrailBlazer sent a revised Reconsideration Letter to Plaintiff. This letter did not address the reduction in the overpayment amount as discussed in the first TrailBlazer reconsideration letter.

37. On August 30, 2012, Plaintiff filed for a request for reconsideration to $Q^2$Administrators. In this letter, Plaintiff asserted that TrailBlazer and Health Integrity never identified the claims by beneficiary and Date of Service ("DOS") as required under federal statute.

38. On September 27, 2012, $Q^2$Administrators issued a partially favorable decision. $Q^2$A did not address all forty claims and 155 claims lines in the sample. $Q^2$Administrators reduced the error rate from 100% to 96% thereby reducing the actual overpayments amount on the claims in the sample from $16,169.06 to $14,451.00.

39. Plaintiff appealed this determination to the Administrative Courts under 42 U.S.C. §1395ff.

40. The Office of Medicare Hearings and Appeals ("OMHA") received Plaintiff's Request for ALJ Hearing on November 23, 2012.

41. On July 18, 2013, the ALJ hearing commenced via teleconference from the OMHA Cleveland Field Office.

42. On January 13, 2015, after Plaintiff exhausted the appeals process, Administrative Law Judge P. Arthur McAfee determined that the statistical sampling used by defendants was invalid and issued a Partially Favorable decision. Plaintiff was only liable for the actual overpayment amounts identified in the claims that were part of the sample

43. The ALJ also determined that the contractors failed to present Plaintiff with a complete accounting report of the post-payment audit, thereby violating section 1893(f) provision of the Act governing post-payment audits.

44. Ultimately, on January 13, 2015 ALJ P. Arthur McAfee ordered defendants to process the claims and any funds received from Plaintiff based on the invalid overpayment demands were ordered to be returned.

45. Plaintiff does not contest the decision of the ALJ.

46. Per Medicare Regulation 42 C.F.R. Part 405, the ALJ's decision became binding and not subject to review 60 days after the January 13, 2015 order.

47. Plaintiff suffered actual economic damages in the amount of $1,000,000.00 per year in lost income beginning in 2010 and continuing until presently for a total of $7,000,000.00.

**FIRST CLAIM FOR RELIEF**
**(Gross Negligence Against Defendants)**

48. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

49. While acting as employees of Medicare, Defendants had a responsibility to exercise the degree of care that a reasonably careful person would have used to avoid making harmful representations and in ascertaining the accuracy of information given to others.

50. Defendant third party contractors, failed to comply with section 1893(f) provision of the Act governing post-payment audits. Congress directs contractors to give written notice of intent to conduct a post-payment audit to a provider chosen for audit. The MR Records Request provided by Health Integrity did not note the reason for review. This same document request did not clearly define the universe of claims subject to the audit, nor did it define the forty claims chosen for the sample.

51. The TrailBlazer redetermination process exceeded the 60 days permitted under the 42 C.F.R. §405.950(a). Section 1893(f)(7)(B) dictates the Medicare auditory "shall give" the Provider, plaintiff, "a full review and explanation of the findings of the audit in a manner that is understandable to the provider." 42 U.S.C. §1395ddd(f)(7)(B). Health Integrity and TrailBlazer failed to adhere to this statutory requirement despite Plaintiff's numerous requests for such information.

7

52. During the audit process, Plaintiff submitted a Rebuttal Packet to TrailBlazer. The MAC never responded to Plaintiff, but instead internally referred the packet to $Q^2$Administrators one month later.

53. TrailBlazer, in its second redetermination letter, repeated the same defects of the first redetermination. Notably, the exclusion of pertinent information required to be provided to Plaintiff under section 1893(f)(7)(B). Specifically, TrailBlazer, who took over a year to issue a decision, failed to address over half of the claims in the sample at redetermination.

54. Plaintiff did not receive a list of the claims in the sample until the $Q^2$Administrators reconsideration decision dated September 27, 2012.

55. Plaintiff's injuries were proximately caused by Defendants' negligent disregard of said duty and Plaintiff suffered economic damages due to that breach. In instituting the Post-payment Audit, defendants interfered with Plaintiff's ability to collect from Medicare for an exorbitant amount of time and thereby caused Plaintiff's operations to cease in 2011.

56. Defendants' violations have caused and will continue to cause, Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

### SECOND CLAIM FOR RELIF
**(Negligent Misrepresentation Against Defendants)**

57. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

58. Defendants, Medicare contractors operating as employees of Medicare, made written representations to Plaintiff that the company had been overpaid in excess of $1,000,000.00 for claims submitted to Medicare for ambulance services provided by Plaintiff.

59. Defendants made the representation to Plaintiff in the course of Defendants' business as Medicare Contractors. As Medicare Contractors, Defendants are required to adhere to certain statutory and internal rules in reviewing payments on claims, submitted by providers that they believed to be false or inaccurate. Medicare would the pay the Contractors for these services.

60. Medicare Contractors are only allowed to use extrapolation to determine overpayment amounts if either: 1) the Secretary makes a determination that there is a sustained or high level of payment error, or there is a determination that documented education intervention has failed to correct the payment error. 42 U.S.C. §1395ddd(f)(3).

61. Neither condition existed in the audit at issue, therefore TrailBlazer and Health Integrity's use of extrapolation in determining overpayment amounts was improper.

62. Ultimately, the $1.2 million demand was a misrepresentation based upon the improper use of extrapolation.

63. Defendants had a pecuniary interest in the misrepresentation because Medicare paid the contractors for investigating and auditing providers like the Plaintiff. Each of the Defendants benefitted financially from auditing the Plaintiff and had no incentive in the speedy disposition of the audit.

64. Defendants made the representations that Plaintiff was overpaid for the guidance of Medicare. Such a determination would prevent Plaintiff from collecting payments from Medicare for ambulance services provided during the audit, and would potentially make the company liable to Medicare for millions of dollars.

65. As a service provider for Medicare patients, Plaintiff justifiably relied on Defendants' misrepresentation that Medicare had overpaid some of the submitted claims and complied with the extensive requests for medical records. Plaintiff also allocated business assets and personnel to address the medical records request. Plaintiff also spent years and company money appealing the Post-payment Audits.

66. Defendants' misrepresentation caused economic injury to the Plaintiff. Plaintiff, a small business, was forced to allocate company time and revenue to obtain the paperwork necessary for the audit. Employees for the Plaintiff who service client accounts were forced to focus on the extensive audit, thus damaging client relationships. During the course of the audit, Plaintiff was unable to collect on current and future Medicare claims—a large part of the company's revenue.

67. Defendants' violations have caused, and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

**THIRD CLAIM FOR RELIEF**
**(Fraud Against Defendants)**

68. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

69. During the audit, two different TrailBlazer Local Coverage Determinations ("LCD") policies were in effect. Each of those policies had two versions during the two-year audit period.

70. LCD L26738 (4T-2AB) was in effect from March 1, 2008 to September 30, 2008. The revised version of this LCD, L26738 (4T-2AB-R1) was in effect from October 1, 2008 to April 13, 2009.

71. LCD version L28627 (4T-3AB) was in effect from April 14, 2009 to April 30, 2009. The revised version of this LCD, L28627 (4T-3AB-R1) was in effect from October 1, 2009 to September 6, 2010.

72. Although LCD L26738 governed 40% of the audit at issue, citations to this LCD rarely appear in the documents provided to Plaintiff.

73. In the $Q^2$Administrators Reconsideration letter, $Q^2$A cited language that is not found in any of the four versions of the LCD. It actually refers to a more recent version that does not cover any of the dates within the audit.

74. Health Integrity used misleading quotations from multiple LCDs to make incorrect and fraudulent representations to Plaintiff. In its letters to Plaintiff, Health Integrity provided misleading citations to the LCD by dual citing different versions. Some communications with Plaintiff cite both LCDs, however only truly quote one. The ZPIC would fraudulently craft and customize language from two different version of the LCD to support non-coverage rulings for claims submitted by Plaintiff and represent those quotations as justification for denying coverage.

75. Defendants made material representations to Plaintiff by asserting that the LCD prevented coverage of certain claims based on language not present in any of the LCD versions.

76. Another fraudulent act perpetrated by Defendants was the reference to Dr. Holly Pu, PhD as the statistician who reviewed Health Integrity's statistical methodology and approved such methodology in a written statement prior to initiating the audit against Plaintiff as the Medicare Program Integrity Manuals ("MPIM") require. Dr. Holly Pu, PhD is listed on the TrailBlazer Sampling and Extrapolation checklist as having approved the Sampling methodology, however Dr. Holly Pu is not listed on the January 2011 Recoupment Recommendation. Had she approved this statistical methodology prior to its use in the audit, her name would have appeared in the Recoupment Recommendation. This fraudulent information was provided to the Plaintiff as justification for the extrapolation method employed to determine his overpayment amount.

77. The material representation was false because Dr. Pu did not approve of the statistical methodology prior to its use in the audit.

78. When the representation was made, Defendants knew the representation was false, because they were the administrators of the audit and had sole access to the information. When the Quality Checklist was completed, TrailBlazer employees had access to the Recoupment Recommendation to note the Dr. Pu had in fact, not approved of the statistical methodology, yet they indicated that she was.

79. Defendants made the representation that Dr. Pu had previously approved the statistical methodology with the intent to disguise their failure to meet MPIM regulations.

80. The statistical methodology was used despite TrailBlazer's failure to obtain the required written approval. The prohibited statistical sampling method was used to determine the overpayment amount.

81. Plaintiff suffered economic injury during the audit, because the company was unable to collect on claims for services provided to Medicare patients—the majority of the company's revenue. This drastic reduction in revenue caused the company to cease operations in 2011.

82. Defendants' violations have caused, and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

## FOURTH CLAIM FOR RELIEF
(**Tortious Interference of Existing Contract Against Defendants**)

83. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

84. Plaintiff had a valid agreement with HHS under the Medicare Act. Plaintiff provided Ambulance transportation for Medicare patients. Once there was a determination of medical necessity under the Social Security Act, Medicare would pay Plaintiff for those services.

85. Defendants, as Medicare Contractors, knew of Plaintiff's business relationship with Medicare and Plaintiff's interest in the contract. In fact, Health Integrity, LLC was assigned to the Plaintiff's zone to review of claims.

86. Defendants willfully and intentionally interfered with the existing Medicare contract between HHS and the Plaintiff. As Medicare Administrative Contractors on behalf of HHS, Defendants were aware of the business relationship between Plaintiff and HHS. Defendants knew that instituting a Post-payment audit against Acute Care EMS, Inc., and not providing all of the statutorily required information necessary to ascertain the validity or properly contest the audit would delay Plaintiff's ability to appeal the demand for overpayment recoupment.

87. Failure to provide the appropriate information prolonged the audit process and prohibited Plaintiff from collecting on Medicare claims for services provided to Medicare patients during the audit process.

88. Prohibited statistical methodology used during the audit caused Plaintiff economic hardship which ultimately resulted in Plaintiff ceasing operations in 2011.

89. Defendants' interference with Plaintiff's contract proximately caused injury to Plaintiff. Plaintiff suffered damage because Defendants' interference prevented Plaintiff from continuing the Plaintiff's business relationship with HHS. When Acute Care EMS, Inc. was unable to collect from

HHS for the services provided to Medicare patients for over one year while the audit was conducted, the company lost a substantial amount of revenue. This lack of revenue caused the company to cease operation in 2011.

90. Defendants' actions also tortiously interfered with a contract Plaintiff maintained with the Department of Corrections for the transport of inmates. To meet the confusing and often inconsistent medical records demands of the audit instituted by Defendants, Plaintiff had to allocate employees, who otherwise would assist clients and service client accounts, to the process of records retrieval. Unable to meet the needs of existing client like the Department of Corrects, Plaintiffs business relationships deteriorated until their services were no longer requested. The loss of these service requests are directly attributable to the actions of Defendants and contributed to Plaintiff loss of revenue.

91. Defendants' violations have caused, and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

**FIFTH CLAIM FOR RELIEF**
**(Conspiracy Against Defendants)**

92. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

93. Defendants worked together to accomplish one or more unlawful acts. As discussed above, the Contractors were paid by Medicare to investigate and audit providers for claims submitted for payment. To prolong the audit, TrailBlazer and Health Integrity refused to provide necessary, statutorily required, information used for the purpose assessing the validity of the audit, and, should Plaintiff deem appropriate, appeal such audit.

94. Defendants had a meeting of the minds to accomplish those unlawful acts. For example, if Health Integrity had written and maintained explicit information as to how the universe and sample were defined, and submitted such information to Plaintiff, there would be no conflict about which claims were assigned to those categories. More importantly, had TrailBlazer properly evaluated those

13

Health Integrity documents and responded to Plaintiffs multiple requests for such information within those documents, Defendants could have prevented a huge waste of Plaintiff's financial resources and time.  Instead, TrailBlazer and Health Integrity collaborated to waste Plaintiff's time and resources while it sought information from both parties; each claiming the other had the requested information.

95.  Plaintiff suffered damages as a proximate result of Defendants' actions. The audit of Plaintiff's 2008-2010 claims lasted over one year. During such time Plaintiff was not permitted to receive payment for Medicare claims it submitted.

96.  Plaintiff expended large amounts of time and resources in attempting to recover information Medicare regulations say should have been provided at the outset.

97.  Defendants' violations have caused, and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

## SIXTH CLAIM FOR RELIEF
### (Malicious Civil Prosecution Against Defendants)

98.  Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

99.  Plaintiff was a party to an administrative proceeding instituted by and continued against the Plaintiff. The administrative proceeding culminated in a decision by an Administrative Law Judge.

100.  Defendants sought reimbursement for alleged Medicare overpayment.

101.  Defendants acted with malice in instituting the audit proceedings. Defendants were aware of the deficiencies in the documentation provided to Plaintiff, including but not limited to failure to properly define the universe and sample, failure to identify claims by beneficiary and DOS, failure to obtain written approval from a statistician for statistical methodologies employed during the audit, failure to maintain CMS mandated documentation, failure to provide information in a manner that the Provider can understand, and failure to serve Plaintiff when filing documents with the ALJ, Defendants continued the administrative proceedings against Plaintiff thereby acting with malice.

102. Defendants did not have probable cause to institute the audit proceeding because they were aware of the deficiencies in the information provided to Plaintiff before, during and after the audit as well as their own failure to meet regulatory prerequisites in using the statistical methodologies during the audit.

103. The Post-payment Audit proceeding was terminated in Plaintiff's partial favor on January 13, 2015 by Administrative Law Judge P. Arthur McAfee.

104. Defendants' wrongful conduct caused the Plaintiff the following damages: injury to their reputation and goodwill. During the audit Plaintiff's revenues decrease drastically, causing the company to lose value and hindering its ability to meet client needs. Thereby harming its reputation and goodwill. This culminated in Plaintiff ceasing operations in 2011.

105. Defendants' violations have caused, and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

## SEVENTH CLAIM FOR RELIEF
(**Federal Tort Claims Act Against Defendants**)

106. Plaintiff hereby incorporates by reference all stated paragraphs set forth herein.

107. The Federal Tort Claims Act permits private citizens to pursue claims against the government and its actors.

108. Defendants are contractors for Medicare and as such, act on behalf of Medicare and the United States.

109. As Medicare contractors, Defendants had a duty to exercise ordinary care when conducting a post-payment audit of Plaintiff.

110. Defendants were required by federal regulations as well as rules promulgated by the Center for Medicare & Medicaid Services to maintain documentation relating to audits of Medicare Providers.

111. Defendants breached that duty when they acted negligently in its failure to meet clearly delineated federal regulations and CMS rules. As discussed above, Defendants had a duty to maintain

15

documents used during the audit, to provide certain information to the Plaintiff before and after the audit, make sure the information provided was clear and in a manner in which Plaintiff could understand, and to provide redetermination results within 60 days of the Plaintiff.

112. Defendants negligently failed to meet these requirements.

113. Defendants' violations have caused and will continue to cause Plaintiff to suffer undue hardship, irreparable harm, and economic injury.

## EXEMPLARY DAMAGES

Plaintiff requests exemplary damages for all of the above claims for relief.

114. Plaintiff would show that on the occasion in question Defendants made certain representations to Plaintiff with the intention of inducing the Plaintiff to rely upon such representations when Defendant knew such representations were false. Plaintiff would show that Plaintiff relied upon such representations believing them to be true and suffered severe damages as a result.

115. Defendants acts or omissions described above, when viewed from the standpoint of the Defendants at the time of the act or omission, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff and others. Defendants had actual, subjective awareness of the risk involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and others.

116. Based on the facts stated herein, Plaintiff requests exemplary damages be awarded to Plaintiff from the Defendants.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

117. Assume Jurisdiction over this case.

118.  Award the Plaintiff reasonable costs, actual damages, exemplary damages, and expenses.

119.  Grant such other and further relief as the court deems equitable and just under the circumstances.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information , and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by an evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirement of Rule 11.

Respectfully Submitted,

/s/_____
Dominique M. Boykins
State Bar No.
13415 Reads Court
Houston, Texas 77015
(281) 660-5624
dmboykins42@gmail.com
**ATTORNEY FOR PLAINTIFF**